ADP, LLC,

    Plaintiff,

    v.

SUMMER PITTMAN,

    Defendant.

Civ. No. 19-16237 (KM) (MAH)

**OPINION**

## KEVIN MCNULTY, U.S.D.J.:

Defendant Summer Pittman spent nine years employed in various sales positions by Plaintiff ADP, LLC. During that time, she and ADP signed several restrictive covenants in which she agreed that in the event of her non-employment by ADP, she would for a period not (1) compete with ADP, (2) disclose its confidential information, or (3) solicit its clients. In June 2019, Pittman abruptly left ADP and accepted a position with one of its competitors. ADP considers this a violation of several provisions of the restrictive covenants and now moves this Court for entry of an order enjoining Pittman from: (1) continuing to breach her non-compete obligations; and (2) breaching the other restrictive covenant obligations owed to ADP. (DE 3).

For the reasons that follow, APD's motion is **GRANTED**.

## I.    BACKGROUND[1]

### A. Pittman's Employment

ADP employed Pittman for about nine years in various sales positions, always in the Pacific Northwest. (DE 3-5 ¶ 3) ADP first hired her on February

---

[1]    Certain key items from the record will be abbreviated as follows:

DE __    =    Docket entry number in this case

Compl.    =    Complaint and jury demand (DE 1)

22, 2010. (*Id.*). On September 12, 2016, the company promoted her to Pacific Northwest district sales manager in its Global Enterprise Solutions division. (*Id.*). Pittman remained in that role until she voluntarily left ADP on June 14, 2019. (*Id.*).

As a district sales manager, Pittman sold ADP's products and services to existing and prospective clients. (*Id.*). Her market and territorial designation consisted of companies employing between 1,000 and 10,000 people, in Alaska, Oregon, Vancouver, and Washington.[2] (*Id.* ¶ 4). In that role, Pittman was responsible for cultivating, developing, and maintaining business relationships with existing and prospective clients. (*Id.*). She was also charged with marketing and selling products that provide payroll, time and attendance, human resources management, and other tools to employers. (*Id.*). These products included WorkForce Now, Vantage, Global View, and Lifion. (*Id.*). However, Pittman primarily sold WorkForce Now. (DE 13-2 ¶ 5). She rarely attempted to sell other ADP products and even more rarely succeeded. (*Id.*).

---

[2]    While working for ADP, Pittman was not assigned a territory *per se*. (DE 13-2 ¶ 7). Instead, she was tasked with serving the accounts of specific, designated existing and prospective clients. (*Id.*). ADP gave Pittman a database that identified approximately 80 to 120 existing and prospective clients to which she was assigned to sell ADP products. (*Id.*). Those clients were in Alaska, Oregon, Vancouver, and Washington. Pittman was not the only ADP salesperson selling to the existing and prospective clients in Oregon and Washington. (*Id.*). There were four other ADP salespeople servicing accounts in those states. (*Id.*). Thus ADP never assigned Pittman to solicit business from *all* client prospects in Oregon and Washington. (*Id.*). She recalls that ADP directed her only to solicit two existing or prospective clients in Alaska and two or three existing or prospective clients in Vancouver. (*Id.*).

While working for ADP, Pittman did not cold-call existing or prospective clients who had not been specifically identified on her database. (*Id.*). In fact, Pittman was prohibited from selling to existing or prospective clients without prior authorization. (DE 13-2 ¶ 8). Instead, Pittman's responsibilities consisted of selling additional business to existing ADP clients and prospecting for new business from clients on the same database. (*Id.*). ADP employed other sales representatives who sold to the same ADP clients as those assigned to Pittman, but those representatives sold benefit services, time and attendance solutions, global solutions, recruiting solutions and health compliance solutions—products and solutions that Pittman did not sell. (DE 13-2 ¶ 9).

After Pittman would close a deal, ADP expected her to move on to the next deal. (*Id.*). She was expected not to "waste time getting close to a client." (DE 13-2 ¶ 10). Instead, that responsibility was passed on to client relationship managers, the employees ADP specifically tasked with maintaining those ongoing relationships. (*Id.*).

### B. The Nondisclosure Agreement and the Sales Representative Agreement

On March 1, 2010, when Pittman was hired, she and ADP—as a routine matter—signed a non-disclosure agreement ("NDA"). [3] (DE 1-1). The NDA is intended to bind ADP and its new employee before the associate is exposed to ADP's confidential business information and other data about ADP's existing or prospective clients. (*Id.* ¶ 9). The NDA contains restrictions designed to protect those confidences and client goodwill, as well as other protectable business interests. (DE 3-5 ¶ 10). The NDA also contains a return-of-property provision. (DE 1-1 ¶ 1(a)–(b)).

ADP requires new sales associates to sign the NDA because it wants to protect the confidential information that sales associates obtain in the course of their duties. (DE 3-5 ¶ 11). In this manner, ADP hopes to protect the client relationships and goodwill that sales associates develop during their time at the company. (*Id.*).

At the same time, Pittman also signed a Sales Representative Agreement ("SRA"), which includes non-solicitation, non-disclosure, non-use and non-hire provisions.

### C. ADP's Training

After Pittman began working for ADP, the company provided her with specialized training. (DE 3-5 ¶ 17). ADP claims that this training is unique and unmatched by its industry competitors. (*Id.*). In the course of training, ADP provides sales associates like Pittman significant information about ADP and

---

[3]   The NDA is a condition of employment for all new ADP sales associates. (DE 1-1).

its products and services. (*Id.* ¶ 14). Sales associates also obtain information about the specific clients they service. (*Id.*). The training information includes the strengths and weaknesses of ADP's products and services; the strengths and weaknesses of other ADP sales associates; the way ADP sells its products and services; the way ADP differentiates its products and services from its competitors; the relative advantages and disadvantages between ADP's products and services and those of its competitors; the methods by which ADP effectively competes with its competitors; ADP's pricing models and costs; ADP's planned improvements and expected new products; and complaints made by ADP customers. (*Id.*). This information is generally confidential to ADP, and ADP prohibits its disclosure or use by former employees. (*Id.*). During her time at ADP, Pittman gained substantial access to this sort of confidential information. (*Id.* ¶ 17). She also had significant and direct contact with ADP's existing and prospective clients. (*Id.* ¶ 17).

During her time at ADP, Pittman also had access to, and regularly used, ADP's confidential, proprietary, and trade secret information. (*Id.*). This information included ADP's confidential business methods; procedures, pricing, and marketing strategies; client information, including names, preferences, and needs; and information regarding the terms of client contracts. (*Id.*). ADP attempts to maintain the secrecy of this proprietary information by requiring employees to sign NDAs; limiting access to proprietary information on a need-to-know basis; requiring security and password protection on its work systems; and reminding and training its employees about the sensitive nature of this information. (Compl. ¶ 21).

### D. ADP's Restricted Stock Award Program and Restrictive Covenant Agreements.

As an incentive program, ADP offers to certain high-performing employees the opportunity to participate in a stock-award program. (DE 3-5 ¶ 12). Under the terms of that program, sales employees who meet their sales targets are annually offered restricted stock in ADP. (*Id.*). ADP conditions the receipt of restricted stock awards on the acceptance by eligible sales associates

of restrictive covenants. (*Id.* ¶ 13). The restricted stock is designed to be a reward to attract, retain, and motivate ADP employees and to strengthen the mutual interest between the employees and ADP. (*Id.* ¶ 12).

As part of the electronic acceptance process in connection with the award of stock, ADP requires employees to accept the terms of these restrictive covenants. (DE 3-8 ¶ 7). An employee is unable to accept an award of restricted stock without first acknowledging that he or she has read the associated agreements and has accepted the restrictive covenant agreement. (*Id.*). This acceptance scheme is designed to require acceptance or rejection of the entire agreement associated with the award. (*Id.* ¶ 11).

### E. Terms and Conditions of the RCA

The restrictive covenants associated with the the receipt of restricted stock are more extensive than those found in the standard NDA. (DE 3-5 ¶ 13). ADP believes that sales associates who achieve annual sales targets have demonstrated that they maintain the strongest relationships with ADP's existing and prospective clients, best utilize ADP's marketing strategies and resources, effectively leverage their knowledge about ADP's products and services and unique information about ADP's existing and prospective clients, use their external networks, and best trade on ADP's reputation in the marketplace. (*Id.*). Sales associates who receive restricted stock awards are generally involved with and have the most information about the largest numbers of ADP's existing and prospective clients. (*Id.*).

During their duties, ADP sales associates obtain significant information about ADP and its products and services and about the specific clients they service. (*Id.* ¶ 14). Again, this includes the strengths and weaknesses of ADP's products and services; the strengths and weaknesses of other ADP sales associates; the way ADP sells its products and services; the way ADP differentiates its products and services from its competitors; the relative advantages and disadvantages between ADP's products and services and those of its competitors; the methods by which ADP effectively competes with its

competitors; ADP's pricing models and costs; ADP's planned improvements and expected new products; and complaints made by ADP customers. (*Id.*). Most of this information is confidential to ADP and is thus never to be disclosed or used by former employees. (*Id.*).

ADP also recognizes that the loss of a high-performing sales associate to a competitor poses a particularly high risk to ADP with respect to client and prospect relationships, ADP's goodwill, and the use and misappropriation of its confidential trade secret information relating to its operations, clients and prospects. (*Id.* ¶ 15).

ADP thus requires more extensive restrictive covenants in exchange for its restricted stock awards, in recognition of the fact that those high-performing sales associates—because of their unique knowledge, skills, and job performance—have the greatest potential to disrupt ADP's relationships with its existing and prospective clients, to harm the goodwill ADP has generated in the market, and to misappropriate confidential and trade secret information about ADP and its existing and prospective clients. (*Id.* ¶ 16).

### 1. Non-Solicitation

The RCA imposes on its employee-signatories a greater burden than the SRA and NDA do, and the RCA's terms make it more difficult for a former employee to compete with ADP after he or she leaves the company. The RCA contains a non-solicitation provision that is stronger than the one found in the SRA. The RCA's provision prohibits employees, for one year after their departure from ADP, from soliciting any clients to whom ADP (1) provides; (2) has provided; or (3) reasonably expects to provide business within the two-year period following the employee's departure.[4]

Unlike the SRA, which only prohibits solicitation of those ADP clients with whom the former employees were involved or exposed, the RCA also

---

[4] For clarity, the *two-year* period following the employee's departure refers to clients to whom ADP reasonably expects to provide business; the *one-year* period following the employee's departure refers to the (former) employee's non-solicitation obligation.

prohibits solicitation of *all* current and prospective ADP clients. IN addition, while the SRA prohibits former employees from soliciting ADP's *marketing* partners, the RCA also prohibits former employees from soliciting ADP's *referral* partners.[5]

### 2. Non-Compete

The RCA also contains a non-compete provision, which the SRA and the NDA do not have. The non-compete provides that, for one year after their departure from ADP, employees may not "participate in any manner with a Competing Business" in the geographic area where the employee worked or had contact with ADP clients if working in that area would require the employee to "provide the same or substantially similar services to a Competing Business as those which [they] provided to ADP while employed." The non-compete provision also prohibits (former) employees from using or disclosing ADP's trade secrets or other confidential information.

### F. The 2017 Restrictive Covenant Agreement

The 2017 RCA contains the following pertinent provisions:

1. Definitions.

. . .

> d. "Competing Business" means any individual (including me), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is engaged in any business or enterprise that is the same as, or substantially the same as, that part of the Business of ADP in which I have worked or to which I have been exposed during my employment with ADP (regardless of whether I worked only for a particular segment of that part of the business in which I worked—for example, business segments based on the number of employees a Client has or a particular class of business using an ADP product or service).

---

[5]     Together, ADP defines referral partners and marketing partners as its Business Partners.

. . .

> j. "Territory" means the geographic area where I worked, represented ADP, or had Material Business Contact with ADP's Clients in the two (2) year period preceding the termination of my employment with ADP.

. . .

3. Non-Competition. I agree that during my employment and for a period of twelve (12) months from the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, directly or indirectly, own, manage, operate, join, control, finance, be employed by or with, or participate in any manner with a Competing Business anywhere in the Territory where doing so will require me to (i) provide the same or substantially similar services to a Competing Business as those which I provided to ADP while employed, or (ii) use, disclose or disseminate ADP's Confidential Information or trade secrets. However, after my voluntary or involuntary termination of my employment for any reason and with or without cause, nothing shall prevent me from owning, as an inactive investor, securities of any competitor of ADP which is listed on a national securities exchange.

4. Non-Solicitation of and Non-Interference with Clients, Business Partners, and Vendors.

> a. Clients: I agree that during my employment and for a period of twelve (12) months following the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, either on my own behalf or for any Competing Business, directly or indirectly, solicit, divert, appropriate, or accept any business from, or attempt to solicit, divert, appropriate, or accept any business from any Client for the purposes of providing products or services within the United States of America that are the same as or substantially similar to those provided in the Business of ADP. I also agree that I will not induce or encourage or attempt to induce or encourage any Clients to cease doing business with ADP or materially alter their business relationship with ADP.

b. Business Partners: I agree that during my employment and for a period of twelve (12) months following the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, either on my own behalf or for any Competing Business, directly or indirectly engage, contract with, solicit, divert, appropriate or accept any business from, or attempt to engage, contract with, solicit, divert, appropriate or accept any business from any Business Partner for the purpose of providing to me or any Competing Business any product or service within the United States of America that is (a) the same as or substantially similar to the product or service provided to ADP and which ADP uses for, uses for obtaining, or distributes to, its Clients or (b) specialized, customized or designed by the Business Partner for ADP. This provision applies only to a Business Partner: (i) with whom ADP currently has a commercial or business relationship in connection with the Business of ADP; (ii) with whom ADP has had a commercial or business relationship in connection with the Business of ADP within the one (1) year period prior to my voluntary or involuntary termination of employment, for any reason, with or without cause, from ADP; or (iii) about whom I have any Confidential Information or trade secret information. I also agree that I will not induce or encourage or attempt to induce or encourage any Business Partner to cease doing business with ADP or materially alter their business relationship with ADP.

c. Vendors: I agree that during my employment and for a period of twelve (12) months following the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not induce or encourage or attempt to induce or encourage any Vendor to cease doing business with ADP within the United States of America or materially alter their business relationship with ADP within the United States of America.

. . .

6. Non-Disclosure and Non-Use of Confidential Information and Trade Secrets. During my employment, except as authorized and required to perform my duties for ADP, and after the voluntary or involuntary termination of my employment for any reason and with

or without cause, I will not access, disclose, use, reproduce, distribute, or otherwise disseminate ADP's Confidential Information or trade secrets or take any action causing, or fail to take any action necessary in order to prevent, any such information to lose its character or cease to qualify as Confidential Information or a trade secret. I agree to inquire with ADP if I have any questions about whether I am authorized or required to access, disclose, use, reproduce, distribute, or otherwise disseminate ADP's Confidential Information or whether particular information is Confidential Information or a trade secret before accessing, using or disclosing such information. I understand, however, that nothing in this Restrictive Covenant Agreement prohibits me from reporting possible violations of federal law or regulation to any governmental agency or entity or from communicating with any such agency or entity regarding the same. I also agree to immediately return to ADP all property and information belonging to ADP such as keys, credit cards, telephones, tools, equipment, computers, passwords, access codes, pin numbers, and electronic storage devices, as well as all originals, copies, or other physical embodiments of ADP's Confidential Information or trade secrets (regardless of whether it is in paper, electronic, or other form), including any such information in any programs, business forms, manuals, correspondence, files, databases, or on computer disks or any other storage medium, including but not limited to cloud storage, whether or not owned or controlled by me or ADP (e.g., social and business networking websites, web-based email servers, Notability, or cloud storage services), immediately upon termination of my employment or upon any earlier request by ADP, and I agree not to keep, access, disclose, use, reproduce, distribute, or otherwise disseminate any copies, electronic or otherwise, of any of the foregoing. I also understand that my obligations under this paragraph, as well as the other covenants in this Agreement, extend to my activities on the internet, including my use of business oriented social networking sites such as LinkedIn and Facebook. This shall include deleting any business related connections or contacts, including all ADP Clients and Business Partners, that I inputted in or with whom I connected on any business oriented social networking sites, my LinkedIn account, any cloud storage, any electronic device, or any cell phones while employed at ADP. Pursuant to 18 U.S.C. § 1833(b), and as set forth

fully therein, notice is hereby given that an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law; or is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal and does not disclose the trade secret, except pursuant to court order.

7. Prior Agreements and Disclosure of Agreement to Third Parties. I represent that I am not a party to any agreement with any former employer or any other person or entity containing any nondisclosure, non-compete, non-solicitation, non-recruitment, intellectual property assignment, or other covenants that will affect my ability to devote my full time and attention to the Business of ADP that has not already been disclosed to ADP in writing. I also agree to provide a copy of this Agreement to any subsequent employer, person, or entity to which I intend to provide services that may conflict with any of my obligations in this Agreement prior to engaging in any such activities and to provide ADP in writing the name and address of any such employer, person, or entity and a description of the services I intend to provide prior to engaging in any such activities. I agree that ADP may also provide a copy of this Agreement or a description of its terms to any Client, subsequent employer, or other third party at any time as it deems necessary to protect its interests, and I agree to indemnify ADP against any claims and hold ADP harmless from any losses, costs, attorneys' fees, expenses, fees, and damages arising out of my failure to comply with this paragraph or ADP's providing a copy of this Agreement or a description of its terms to any Client, subsequent employer, or other third party.

. . .

9. Choice of Law, Venue, and Jurisdiction. The interpretation, validity, and enforcement of this Agreement will be governed by the laws of the State of New Jersey, without regard to any conflicts of

law principles that require the application of the law of another jurisdiction. I agree that any action by me to challenge the enforceability of this Agreement must be brought or litigated exclusively in the appropriate state or federal court located in the State of New Jersey. I also agree that any action by ADP to enforce this Agreement, as well as any related disputes or litigation related to this Agreement, may, but do not have to, be brought in the appropriate state or federal court located in the State of New Jersey. I agree and consent to the personal jurisdiction and venue of the federal or state courts of New Jersey for resolution of any disputes or litigation arising under or in connection with this Agreement or any challenge to this Agreement and waive any objections or defenses to personal jurisdiction or venue in any such proceeding before any such court.

. . .

11. Relief, Remedies, and Enforcement. I acknowledge that ADP is engaged in a highly competitive business, and the covenants and restrictions contained in this Agreement, including the geographic and temporal restrictions, are reasonably designed to protect ADP's legitimate business interests, including ADP goodwill and client relations, Confidential Information and trade secrets, and the specialized skills and knowledge gained by me and ADP's other employees during our employment. I acknowledge and agree that a breach of any provision of this Agreement by me will cause serious and irreparable damage to ADP that will be difficult to quantify and for which a remedy at law for monetary damages alone may not be adequate. Accordingly, I agree that if ADP should bring an action to enforce its rights under this Agreement and ADP establishes that I have breached or threatened to breach any of my obligations under this Agreement, ADP shall be entitled, in addition to all remedies otherwise available in law or in equity, to a temporary restraining order, a preliminary injunction, and a permanent injunction enjoining such breach or threatened breach in any court of competent jurisdiction without the necessity of posting a surety bond, as well as an equitable accounting of all profits or benefits arising out of any violation of this Agreement. I also agree that nothing in this Agreement shall be construed to prohibit ADP from pursuing any and all other legal or equitable remedies available to it for breach of any of the provisions of this Agreement, including the disgorgement of any profits, bonuses, commissions,

or fees realized by me, any subsequent employers, any business owned or operated by me or to which I provide services, or any of my agents, heirs, or assigns. I also agree that that the knowledge, skills, and abilities I possess at the time of commencement of my employment are sufficient to permit me to earn a livelihood satisfactory to me without violating any provision of paragraphs three (3) through seven (7) above, for example, by using such knowledge, skills, and abilities, or some of them, in the service of business that is not competitive with ADP. I further agree to pay any and all legal fees, including without limitation, all attorneys' fees, court costs, and any other related fees and/or costs incurred by ADP in enforcing this Agreement.

12. Tolling. The restricted time periods in paragraphs three (3) through six (6) above shall be tolled during any time period that I am in violation of such covenants, as determined by a court of competent jurisdiction, so that ADP may realize the full benefit of its bargain. This tolling shall include any time period during which litigation is pending, but during which I have continued to violate such protective covenants and a court has declined to enjoin such conduct or I have failed to comply with any such injunction.

. . .

15. Electronic Signature. I agree that ADP may enforce this Agreement with a copy for which I have provided an electronic signature.

. . .

19. Opportunity to Review. I agree that I have read this Agreement before signing it, understand its terms, and that I have had the opportunity to have legal counsel review this agreement, prior to signing it, and I acknowledge that I have not been forced or coerced in any manner to sign this Agreement and do so of my own free will.

(DE 3-8).

### G. Pittman's Acceptance

ADP offered, and Pittman accepted, a restricted stock award on three separate occasions: September 19, 2012; September 2, 2014; and September 1, 2017. (DE 3-8 ¶¶ 5, 14 & 15). In each instance Pittman agreed to an RCA in

13

exchange for an award of ADP restricted stock. (*Id.* ¶ 14–16). Each RCA contained non-competition, non-solicitation, non-disclosure, and non-use restrictive covenants.

### H. Pittman's Association with Ultimate

Pittman left ADP on June 14, 2019 and accepted a position with Ultimate Software Group ("Ultimate") shortly thereafter. (DE 3-5 ¶ 6; Compl. ¶¶ 32–35;). At Ultimate, Pittman holds the title "Business Development Manager." (DE 13-2 ¶ 16). In that position, she solicits business from approximately 115 specifically identified prospective clients that each have more than 2,500 employees. (*Id.*). Ultimate assigned each client to Pittman by way of a database it provided to her. (*Id.*). At Ultimate, Pittman's designated clients are located in Alaska, Hawaii, Idaho, Montana, Oregon, and Washington. (*Id.*). Pittman claims that none of her former ADP clients or prospective clients appear on her Ultimate database. (*Id.*).

ADP and Ultimate are direct competitors. (Compl. ¶ 35). Ultimate's UltiPro product directly competes with an ADP product called Workforce Now. (Compl. ¶ 35). Unlike ADP, however, Ultimate sells UltiPro as a bundled product/service that includes payroll, human resource, and talent management products and services. (DE 13-2 ¶ 13–15). As a result, the cost to clients of UltiPro is nearly always greater than the cost resulting from a client's selection among the unbundled products and services provided by ADP. (*Id.*).

ADP contends that Pittman's position at Ultimate is expressly forbidden by the non-compete provisions of the RCA. (Compl. ¶ 37). ADP further alleges that because Pittman performs on behalf of Ultimate the same job functions as those she performed for ADP in the same sales territory, it is inevitable that she has already or at some point will have used or disclosed ADP's proprietary information for the benefit of Ultimate and to the detriment of ADP. (*Id.* ¶ 39).

Pittman claims that since she joined Ultimate, she has not solicited any of ADP's existing or prospective clients with whom she had any contact or communications while she was worked at by ADP. (DE 13-2 ¶ 16). She also

claims not to have solicited any firms whose names appeared on my ADP database. (*Id.*).

## I. ADP Moves to Enjoin Pittman's Employment

On August 1, 2019, ADP filed a complaint for injunctive relief, (DE 1), and moved for a temporary restraining order, (DE 3). On October 1, the Court held a show-cause hearing as to why an order should not be entered preliminarily enjoining Pittman from competing with ADP in violation of her agreements. (DE 19). The hearing consisted solely of legal argument based on the parties' submissions; neither side sought to introduce live testimony.

## II. APPLICABLE STANDARDS

### A. Federal Preliminary Injunction Factors

The standards governing grant or denial of a preliminary injunction in this court are a matter of federal procedural law. "A plaintiff seeking a preliminary injunction must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (numbering added); *accord Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). Because a preliminary injunction is "an extraordinary and drastic remedy," the plaintiff must establish each element by a "clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948, at 129–30 (2d ed. 1995)). Even then, a trial court's decision to issue a preliminary injunction is "an act of equitable discretion." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).[7]

A Court will consider all four factors, but the first two are essential. *See Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000); *accord Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197 (3d Cir. 1990) (placing particular weight on the probability of irreparable harm and the likelihood of success on the merits, stating: "[W]e cannot sustain a preliminary injunction

ordered by the district court where either or both of these prerequisites are absent." (quoting *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982))); *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir. 1987); *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 151 (3d Cir. 1984); *Am. Express*, 669 F.3d at 366, 374. *But see Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Services*, 724 F.3d 377 (3d Cir. 2013) (debating whether there is a "sliding scale" of the four factors).

### B. State Substantive Law

The substantive rule of decision in this diversity case is New Jersey state law. This Court's "role in diversity cases is to apply state law as announced by the state's highest court." *LaBarre v. Bristol-Myers Squibb Co.*, 544 F. App'x 120, 125 (3d Cir. 2013) (citing *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 253 (3d Cir. 2010) ("A federal court under *Erie* [*R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817 (1938)] is bound to follow state law as announced by the highest state court." (internal citations omitted)). "In the absence of a controlling decision by the [state] Supreme Court, we must predict how it would decide the questions of law presented in this case." *Wolfe v. Allstate Prop., & Cas. Ins. Co.*, 790 F.3d 487, 492 (3d Cir. 2015) (citing *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 45-46 (3d Cir. 2009)); *Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 244 (3d Cir.2010); *New Castle County DE v. National Union Fire Ins. Co. of Pittsburgh, PA*, 243 F.3d 744, 749 (3d Cir. 2001). A federal district court in that position should consider "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Berrier*, 563 F.3d at 46 (quotation and citation omitted).[6]

---

[6]  A difficult issue of interpretation arises where a Court of Appeals' prediction of state law has been undermined by subsequent state authority. Must the district court continue to follow the Court of Appeals' interpretation, or can it take later state authority into account? Does the answer depend on whether the intervening authority is a decision of the State's highest court? *Compare In re Swinton*, 287 B.R. 634, 636 (W.D. Pa. 2003) (district court may consider intervening developments in state law),

## III.   *RAFFERTY* AND *KUSINS*

Although I do not have the benefit of a decision on point by the New Jersey Supreme Court, I do not write on a clean slate. Many decisions, both state and federal, have interpreted the very ADP agreements at issue here. All have analyzed them in light of the so-called *Solari* factors: whether the restriction

> [1] is reasonably necessary to protect [an employer's] legitimate interests,
>
> [2] will cause no undue hardship on the defendant, and
>
> [3] will not impair the public interest.

*Solari Industries, Inc. v. Malady*, 55 N.J. 571, 576 (1970) (numbering and line breaks added for clarity).

Two recent cases in particular structure the Court's analysis: *ADP, LLC v. Rafferty*, 923 F.3d 113 (2019), and *ADP, LLC v. Kusins*, ___ N.J. Super ___, No. A-0692-17T3, 2019 WL 3367212 at *22 (App. Div. July 26, 2019). *Rafferty,* reversing a considerable body of district court case law, held that the RCA "second-tier" restrictions were enforceable, and remanded so that the district courts could apply its holding to the facts of individual cases. *Kusins,* decided after *Rafferty,* endorsed its reasoning and applied it to the facts of the cases before it, involving six departing ADP employees. The task now before me is similar to that performed by the *Kusins* court. Because *Rafferty* sets forth the applicable standard, and because *Kusins* is the highest state court decision applying that standard, it is worth discussing those two cases at some length.

---

with *Itzkoff v. F & G Realty of N.J., Corp.*, 890 F. Supp. 351 (D.N.J. 1995) (district court continues to be bound by Court of Appeals ruling); *Heindel v. Pfizer, Inc.*, 381 F. Supp. 2d 364, 385 (D.N.J. 2004) (citing *Itzkoff* and holding that "[t]his Court is bound by the Third Circuit's prediction of Pennsylvania law."); *Jackson v. Louisville Ladder, Inc.*, No. 11-1527, 2014 WL 460849, at *2 (M.D. Pa. Feb. 5, 2014) ("Once the United States Court of Appeals for the Third Circuit predicts how a state's highest court would resolve an issue, district courts within the circuit are bound by this prediction 'unless the state supreme court issues a contrary decision or it appears from a subsequent decision of the appellate courts that the court of appeals erred.'"), *aff'd*, 586 F. App'x 882 (3d Cir. 2014). No such issue is presented here, however.

## A. The Third Circuit's *Rafferty* Decision

On April 26, 2019, the Third Circuit filed a precedential opinion in *ADP, LLC v. Rafferty*, 923 F.3d 113 (2019). *Rafferty* was an appeal from other cases in this district involving the same ADP restrictive covenant agreements. There, two district courts deciding applications for preliminary injunctions had enforced the NDA and SRA but declined to enforce the RCA. The Court of Appeals reversed as to the RCA and remanded.[7] Because *Rafferty* sets forth the Third Circuit's view of the governing legal standards under New Jersey state law, I quote it at length.

*Rafferty* first laid out well-established principles of New Jersey law regarding the legitimate scope of restrictive employment covenants and the nearly universal practice of judicial "blue penciling" of such covenants to bring them within acceptable bounds:

> For more than a century, New Jersey has upheld restrictive covenants in employment agreements, *see Sternberg v. O'Brien*, 48 N.J. Eq. 370, 22 A. 348, 349–50 (1891); *Mandeville v. Harman*, 42 N.J. Eq. 185, 7 A. 37, 41 (1886), but the state initially applied an inflexible rule rendering overbroad covenants completely unenforceable, *Althen v. Vreeland*, 36 A. 479, 481 (N.J. Ch. 1897) (reasoning that a restrictive covenant "if enforced at all, it must be enforced according to its terms") . . . .
>
> In its seminal decision in *Solari Industries, Inc. v. Malady*, 55 N.J. 571, 264 A.2d 53 (1970), the New Jersey Supreme Court jettisoned the complete-invalidation rule, permitting the partial enforcement of restrictive covenants where consistent with public policy. *See* 264 A.2d at 61. Under its prior approach, the New Jersey Supreme Court recognized, courts struck down restrictive covenants even when "justice and equity seemed to cry out for the issuance of appropriately limited restraints." *Id.* at 60. That is, employers may "act in full good faith" only to "find that the terms of the

---

[7]     Before *Rafferty* was decided, in *ADP, LLC v. Trueira*, 18-3666, 2018 WL 3756951 (D.N.J. Aug. 8, 2018), I followed the lead of those earlier district court decisions and enforced the NDA and SRA, while declining to enforce the RCA. After vacating and remanding those district court decisions in *Rafferty*, the Court of Appeals entered a separate order vacating and remanding *Trueira* for further proceedings. My decision on remand in *Trueira* is filed simultaneously herewith.

noncompetitive agreement are later judicially viewed as unnecessarily broad." *Id.* at 56. Under these circumstances, *Solari* recognized that tailoring overbroad restrictive covenants better accorded with the parties' written agreement than wholesale invalidation. *See id.* In other instances, the complete-invalidation rule encouraged courts to fully enforce "sweeping noncompetitive agreements" where, if given a choice, "they would have cut them down to satisfy the particular needs at hand." *Id.* at 60. Under the new approach, while an employer that "extracts a deliberately unreasonable and oppressive noncompetitive covenant" should receive no benefit, courts should partially enforce an overbroad covenant as long as it is "[1] reasonably necessary to protect [an employer's] legitimate interests, [2] will cause no undue hardship on the defendant, and [3] will not impair the public interest." *Id.* at 56, 61.

Following *Solari*, New Jersey courts have strived, if possible, to salvage restrictive covenants, construing the opinion's three-part test as rarely justifying the total invalidation of a restrictive covenant. *See, e.g., Coskey's Television & Radio Sales & Serv., Inc. v. Foti*, 253 N.J. Super. 626, 602 A.2d 789, 793, 796 (App. Div. 1992) (blue penciling a restrictive covenant that had "devastating effects" on the employee and "only limited" effects on the employer to permit "substantially narrower enforcement"). As to what business interests qualify as "legitimate," *Solari*, 264 A.2d at 61, an "employer has no legitimate interest in preventing competition as such" or simply prohibiting an employee from exercising her "general knowledge" within the industry, *Whitmyer Bros., Inc. v. Doyle*, 58 N.J. 25, 274 A.2d 577, 581 (N.J. 1971); *see Ingersoll-Rand Co. v. Ciavatta*, 110 N.J. 609, 542 A.2d 879, 892–93 (1988). But New Jersey courts have stressed that employers have "patently legitimate" interests in their trade secrets, confidential business information, and customer relationships. *Whitmyer Bros.*, 274 A.2d at 581; *Cmty. Hosp. Grp.*, 869 A.2d at 897. As long as the restrictive covenant reasonably protects one of these matters, the employer has adduced a "strong" business interest. *Ingersoll-Rand*, 542 A.2d at 892.

Most relevant here, in *A. T. Hudson & Co., Inc. v. Donovan*, 216 N.J. Super. 426, 524 A.2d 412 (App. Div. 1987), the Appellate Division enforced a management consulting firm's restrictive covenant to protect its former employee's client relationships. *Id.* at

416. The restrictive covenant, the court recognized, safeguarded the "significant investment of time, effort and money" the consulting firm expended "soliciting clients and developing projects for their benefit." *Id.* A restrictive covenant protects this substantial investment in a discrete set of clients, especially for employees who maintained close, continual contact with the employer's business partners. *See id.* at 413–14, 416; *Coskey's,* 602 A.2d at 795.

If a restrictive covenant reaches beyond an employer's legitimate interests, courts applying New Jersey law have typically resorted to blue penciling the contract's lawful ends. *See Coskey's,* 602 A.2d at 796. For instance, where a restrictive covenant covers products for which no trade secrets existed, courts have blue penciled the agreement to extricate them. *See, e.g., Raven v. A. Klein & Co. Inc.,* 195 N.J. Super. 209, 478 A.2d 1208, 1211-12 (App. Div. 1984); *see also Saccomanno v. Honeywell Int'l, Inc.,* 2010 WL 1329038 at *5 (N.J. Super. Ct. App. Div. Apr. 7, 2010) (limiting an agreement covering all "information" to just "trade secrets or confidential information"). Or, if a restrictive covenant seeks to protect client relationships, courts have narrowed the covenant to clients with which the employee interfaced. *See, e.g., Saturn Wireless Consulting, LLC v. Aversa,* No. 17-1637, 2017 WL 1538157 at *12 (D.N.J. Apr. 26, 2017).

The other two *Solari* factors—undue hardship and the public interest—likewise rarely favor the complete nullification of a restrictive covenant. The second *Solari* factor's focus on *undue* hardship lends itself to blue penciling, not complete invalidation. Seldom could an employee credibly contend that, even where an employer has proffered a legitimate business purpose, *any* enforcement of a restrictive covenant would pose an undue burden. *See Ingersoll-Rand,* 542 A.2d at 892 (a court must balance the employer's interest against the hardship inflicted). And under the "public interest" factor, New Jersey has recognized only two professions for which a client's freedom to choose or the "uniquely personal" nature of the relationship militate against enforcing any restrictive covenant. *Comprehensive Psychology Sys., P.C. v. Prince,* 375 N.J. Super. 273, 867 A.2d 1187, 1190 (App. Div. 2005) (psychologists); *see Jacob v. Norris, McLaughlin & Marcus,* 128 N.J. 10, 607 A.2d 142, 151 (1992) (attorneys); *Cmty. Hosp. Grp.,* 869 A.2d at 895 (noting that "[e]xcept for attorneys and ...

psychologists, our courts have consistently utilized a reasonableness test to determine the enforceability of restrictive covenants" (internal citations omitted)).

Simply put, New Jersey accepts that "non-compete agreements are a common part of commercial employment," and its *Solari* framework "recognizes that noncompete agreements can serve a useful purpose so long as the agreement is not unreasonable." *Maw*, 846 A.2d at 609. To ensure that such agreements remain reasonable, New Jersey courts do not hesitate to blue pencil a covenant but will rarely invalidate one in full. *See, e.g., Cmty. Hosp. Grp.*, 869 A.2d at 899–900.

*Rafferty*, 923 F.3d at 120–22.

*Rafferty* accepted the parties' mutual position that the first-tier restrictions contained in the SRA and NDA, which applied to all employees, were reasonable. It then considered whether an employer could reasonably impose more onerous "second-tier" restrictions, like the RCA here, on a small group of high-performing employees.

The departure of such high-performing employees, the Court held, may implicate especially weighty employer interests:

The preservation of client relationships and the goodwill they generate are among the business interests that New Jersey courts consistently recognize as legitimate and worthy of protection. *See Whitmyer*, 274 A.2d at 581; *A.T. Hudson & Co.*, 524 A.2d at 415. As a client services business, ADP's viability depends on its ability to attract—and retain—its clients. And by setting sales goals for its employees and identifying the subset of employees that meet or exceed those goals, ADP has the ability to empirically measure which of its employees have more extensive client contact. Employees can achieve this more extensive client contact in one of two ways—by virtue of selling to a greater number of customers or by selling more products to a smaller number of customers. Either way, post-termination competition from those employees or their solicitation of ADP's clients and Business Partners would pose a greater threat to ADP's business than would that of employees who failed to meet their sales goals and thus, necessarily, have less contact with ADP's clients. ADP therefore has a legitimate business interest in imposing the RCA on this subset of employees, and the

RCA's heightened restrictive covenants, over and above those in the SRA and NDA, are reflective of the greater damage those employees could inflict on ADP upon their departure.

*Rafferty*, 923 F.3d at 123.

*Rafferty* therefore held that such second-tier restrictions served legitimate employer interests and could not be considered unreasonable *per se*. It rejected *Laidlaw, Inc. v. Student Transp. of America, Inc.*, 20 F. Supp. 2d 727 (D.N.J. 1998), which held that a second-tier restrictive covenant tied to a stock-option award was an unenforceable because its "primary purpose" was "to buy out potential competition." *See Rafferty*, 923 F.3d at 123.

Next, *Rafferty* considered the RCA in relation to the second *Solari* factor, hardship to the employee. Surveying prior cases, it noted that some had confined the RCA's non-solicitation provision to include only customers that the employee had learned of through employment at ADP, as opposed to all ADP customers. Others had confined the non-compete to encompass only a particular territory, or a particular market segment of customers (such as those with fewer than fifty employees). 923 F.3d at 126. While indicating that some blue penciling would be appropriate (as ADP had conceded), the Court of Appeals remanded for consideration of "facts relevant to the extent of the hardship Appellees will suffer if the RCA is enforced, including whether it would preclude the employee from being able to earn a living in his or her occupation, and the fact that both Appellees voluntarily resigned from ADP and chose to immediately join Ultimate, a direct competitor, thereby arguably br[inging] any hardship upon [themselves]." *Id.* (internal citations and quotations omitted).

The final *Solari* factor of "harm to the public" carried no particular weight. *Rafferty* noted that this dispute occurred in an ordinary commercial context with no special public component. Thus, the first two *Solari* factors sufficed to balance the relative interests of ADP and the employees. *Id.* at 127.

On May 28, 2018, the Court of Appeals denied the defendants' petition for a panel rehearing or review en banc.

## B. The Appellate Division's *Kusins* Decision

*ADP, LLC v. Kusins*, ___ N.J. Super ___, No. A-0692-17T3, 2019 WL
3367212 (App. Div. July 26, 2019), is the highest state court decision
interpreting the ADP agreements, particularly post-*Rafferty*.

"In the absence of guidance from the state's highest court, we are to
consider decisions of the state's intermediate appellate courts for assistance in
predicting how the state's highest court would rule." *Downs v. U.S. Pipe &
Foundry Co.*, 441 F. Supp. 2d 661, 663 (D.N.J. 2006) (quoting *Gares v.
Willingboro Twp.*, 90 F.3d 720, 725 (3d Cir. 1996)). "The rulings of intermediate
appellate courts must be accorded significant weight and should not be
disregarded absent persuasive indication that the highest court would rule
otherwise." *U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co.*, 80 F.3d 90, 93
(3d Cir. 1996).

In *Kusins*, the Superior Court of New Jersey, Appellate Division,
interpreted ADP's RCA agreements in relation to six departing employees. 2019
WL 3367212 at *22 (App. Div. July 26, 2019). All six had executed RCAs
substantially similar to the one at issue here, had left ADP, and had gone to
work for competing firms, including Ultimate. 2019 WL 3367212 at *1. *Kusins*
approvingly cited and followed *Rafferty*, applying its reasoning to the facts of
the six cases before it. In a sense, then, *Kusins* performed the post-*Rafferty*
task that is now before this Court, and in doing so pointed the way to this
Court's decision.

*Kusins* first surveyed existing New Jersey case law in terms substantially
similar to the *Rafferty* analysis, *supra*. It then approvingly cited the holdings of
*Rafferty*:

> Earlier this year, the Third Circuit considered ADP's 2014 and
> 2015 RCAs, concluding that, although the covenants were
> overbroad, the RCAs were not unenforceable in their entirety. *ADP,
> LLC v. Rafferty*, 923 F.3d 113 (3d Cir. 2019). In applying the *Solari*
> criteria, the Third Circuit found ADP had "a legitimate business
> interest in imposing the RCA on [its successful salespeople], and
> the RCA's heightened restrictive covenants, over and above those

in the SRA and NDA, are reflective of the greater damage those employees could inflict on ADP upon their departure." *Id.* at 123. We agree.

*Kusins,* 2019 WL 3367212 at *15.

Like *Rafferty, Kusins* found that the departure of certain high-performing employees posed a particularly acute threat to ADP's legitimate interest in its relations with its customers. Thus, ADP could reasonably require additional second-tier restrictions in connection with rewarding those employees' performance. *Id.* at *15–16.[8]

*Kusins* then turned to the counterbalancing factor of hardship to the employees—essentially, the subject of the remand in *Rafferty.* Some hardship, of course, was inevitable; the question was whether any such hardship was undue in light of ADP's legitimate interests. The non-solicitation and non-compete provisions of the RCA were found to impose an undue hardship and were therefore blue penciled in the following fashion.[9]

---

[8]    Recall that those additional restrictions, as relevant here, are as follows:

The RCA's non-compete provision provides that for a one-year period after their departure from ADP, employees may not "participate in any manner with a Competing Business" in the geographic area where the employee worked or had contact with ADP clients if working in that area would require the employee to "provide the same or substantially similar services to a Competing Business as those which [they] provided to ADP while employed."

The non-solicitation provision of the RCA prohibits employees—for one year after their departure from ADP—from soliciting any clients to whom ADP (1) provides; (2) has provided; or (3) reasonably expects to provide business within the two-year period following the employee's departure.

The RCA also prohibits employees from using or disclosing ADP's trade secrets or other confidential information.

[9]    Taking up the hint in *Rafferty, Kusins* rejected any claim of hardship based on termination, because the departing employees had left voluntarily:

We also note that because defendants all voluntarily left ADP to join a direct competitor [Ultimate], they cannot assert their termination as a hardship for our consideration. *See More,* 183 N.J. at 59, 869 A.2d 884 ("If the employee terminates the relationship, the court is less likely to

*Restrictions as to clients with which employee was involved.* The employees, *Kusins* noted, could hardly function at all without approaching any of ADP's 620,000 customers, prospective clients, or businesses with which ADP could expect to do business within two years. *Kusins* therefore narrowed the non-solicitation and non-compete clauses, "conclud[ing] that a non-solicitation clause and non-compete clause may prevent an employee from having any dealings with existing ADP clients that the employee was actively involved with or whose names the employee learned during his or her employment." *Id.* at *17 (citing ADP's concession regarding non-solicitation clause in *Rafferty*).

*Geographical restrictions and restrictions as to market segment.* *Kusins*, citing geographical limitations upheld in other cases, only briefly discussed the validity of the RCA's geographical limitation because parties did not dispute it. *Id.* at 17. In some of the cases under review, the trial court had "loosened the covenant's restriction by blue-penciling the geographical limitation in these clauses to also include a market segment." *Id.*

The only market-segment restriction proposed was based on the size of the customer, measured in number of employees. The *Kusins* court declined to impose such a restriction:

> We cannot discern any rationale in the record to blue-pencil a market segment component into the RCA. There is no evidence that the specialized training, information, or strategic client skills defendants obtained at ADP differed according to the number of employees in the companies they serviced. The customer relationships ADP seeks to protect are the same, regardless of how many employees the client might have.

*Id.*

*Kusins* was not quite explicit as to whether "competition," for purposes of the non-compete clause, is (like the non-solicitation clause) confined to certain actual or prospective clients of ADP. Much of the confusion arises from

_____

find undue hardship as the employee put himself or herself in the position of bringing the restriction into play.").

2019 WL 3367212 at *17.

25

statements in the opinion that refer to the "RCA" generally or fail to distinguish between non-compete and non-solicitation clauses. Thus, the opinion states "that a non-solicitation clause *and non-compete clause* may prevent an employee from having any dealings with existing ADP clients that the employee was actively involved with or whose names the employee learned during his or her employment." 2019 WL 3367212 at *17 (emphasis added).[10] The surrounding context of that statement, however, was a discussion of "hardship" limitations on the non-solicitation clause; I do not believe that this stray reference was intended to imply that a non-compete clause could not impose different restrictions.[11]

---

[10]     In similar fashion, the discussion (but not the holding) of *Kusins* elsewhere appears to conflate the non-compete and non-solicitation clauses. *See, e.g.*, 2019 WL 3367212 at *8 (stating that "portions of the non-compete and non-solicitation clauses that prohibit defendants from providing services for a competitor or soliciting ADP's clients within the same territory they worked in at ADP are enforceable").

This sentence may have been intended as a shorthand reference to the combined effect of the two clauses. Nevertheless, the territorial restriction referred to is contained in the non-compete clause, not the non-solicitation clause. The *Kusins* court did not misapprehend this; deciding one of the six consolidated appeals, it clearly stated the following:

> It is of no import that the ADP clients Hopper solicited were not located in his previous geographic territory. The RCA seeks to protect existing customer relationships, and, as we have established, is enforceable. A geographic limitation is not necessary. As a result, Hopper breached the RCA in soliciting ADP's current clients and employees.

*Id.* at *19.

To be clear, I do not give effect to any dicta in *Kusins* that appear to lump the two clauses. The *Rafferty* decision, which *Kusins* was citing and interpreting, did not do so. *See Rafferty*, 923 F.3d at 126 (noting cases that had restricted the non-solicitation clause to ADP customers, or restricted the non-compete clause to a geographic area or market share). And indeed, the *Kusins* case's definitive statement of its holding, quoted at page 27, *infra*, did not contain any such imprecision. *See id.* at *21.

[11]     The more restrictive interpretation is also in some tension with the fundamental rationale of *Rafferty*: that ADP was entitled, in exchange for additional consideration, to impose additional and further restrictions on high-performing employees. To limit the RCA's non-compete clause in this manner would render it not quite, but nearly, superfluous; the SRA, in particular, already prohibits all ex-employees from having actual or attempted contact or communication of any kind

26

Here I am guided by the closing passage of the *Kusins* opinion, in which the Appellate Division definitively stated its holding:

> *In sum,* we reverse the orders granting summary judgment. We blue-pencil the RCAs to prohibit the ***direct or indirect solicitation*** of ADP's actual clients defendants had substantial dealings with while at ADP or who defendants had knowledge of during their prior employment. We also blue-pencil the clauses to prevent the ***direct or indirect solicitation*** of ADP's prospective clients that a former employee gained knowledge of during his employment at ADP.
>
> The geographical limitation ***in the non-compete clause*** is a reasonable restriction. A market segment restriction is not. Because ADP demonstrated a legitimate protectable business interest and the RCAs as blue-penciled did not impose an unreasonable hardship on defendants, the RCAs are enforceable. We are satisfied these blue-pencil modifications result in "narrowly tailored" provisions that "ensure the covenant is no broader than necessary" with respect to its duration, area, and scope of prohibited activities in order to "protect the employer's interests."

*Id.* at \*21 (***emphasis*** added) (quoting *Cmty. Hosp.*, 183 N.J. at 58–59).

This, in my view, constitutes a clear statement that the non-solicitation clause is limited to certain actual and prospective ADP clients, without respect to geography; the non-compete clause, on the other hand, encompasses a broader class of customers but is limited geographically. Both, of course, are temporally limited to a term of one year.

## IV. APPLICATION OF PRELIMINARY INJUNCTION FACTORS

ADP argues that the four preliminary injunction factors weigh in its favor and asks the Court to enjoin Pittman from: working for Ultimate or any competitor in Alaska, Oregon, Vancouver, and Washington for twelve months; violating the RCA; using or disclosing confidential information, or trade secrets; interfering with any contract, client relationship, prospective client relationship, or marketing partner relationship; and breaching any loyalty

---

with "clients, bona fide prospective clients or marketing partners of businesses of the Company with which the Employee was involved or exposed." (SRA ¶ 4, quoted above)

obligation to ADP. Pittman maintains that ADP has not met its burden and that injunctive relief is not merited.

The enforceability of the NDA and SRA does not appear to be contested at this point. Realistically, the dispute here is over the scope and enforceability of the additional restrictions contained in the RCA.

### 1. Likelihood of Success on the Merits

On a motion for a preliminary injunction, ADP must demonstrate its likelihood of success on the merits. *See SK & F. Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055, 1066 (3d Cir. 1980). That is, ADP need only establish "a reasonable probability, not the certainty, of success on the merits." *Id.*

ADP takes the position that Pittman's conduct violates the RCA. Pittman insists it does not, noting that ADP cannot point to a single client she has taken from her former employer. However, this argument misstates both the scope of the RCA and relevant case law. In light of the recent decisions by the Third Circuit and the Appellate Division that hold that ADP's non-compete agreement is enforceable—though potentially overbroad—ADP is likely, under *Solari*, to prevail on the merits of this action.

### (a) Legitimate Business Interest

Preservation of client relationships is a legitimate business interest that is worthy of protection. *See Whitmyer*, 58 N.J. at 33; *A.T. Hudson & Co.*, 82 N.J. Super. at 508. ADP depends on its ability to attract and retain clients. Both *Rafferty* and *Kusins* have identified ADP's "legitimate and protectable interest in its customer relationships sufficient to justify enforcement of its RCA." *Kusins*, 2019 WL 3367212 at *16.

By setting goals for its employees and identifying those who meet them, ADP can identify the employee-sources of the most client contact. To increase client contact, an employee can either (1) sell to a greater number of customers or (2) sell more products to an existing customer base. Either represents an increase in revenue if the employee is selling on behalf of ADP, and either represents a decrease in revenue if the employee is selling on behalf of a

competitor. Thus, ADP has a legitimate business interest in imposing the RCA restrictions on its best-performing employees, who have been commensurately rewarded with a stock bonus. The increased burden of the RCA reflects the greater danger those employees pose if they were to leave ADP for a competitor.

Here, Pittman has accepted a position with Ultimate, a direct competitor. That new position carries responsibilities that are substantially similar to those she had at ADP. AT Ultimate, Pittman sells substantially similar and overlapping products and services. Finally, she sells in some of the same territories in which she worked when at ADP.

It is difficult to imagine that Pittman would *not* gain an advantage over ADP simply by having been a party to its trade secrets and confidential information. The resulting diversion of business from ADP, whether inadvertent or intentional, necessarily harms the firm. With the benefit of the intervening authority of *Kusins* and *Rafferty,* I find that ADP's imposition of the RCA to limit the spread of its trade secrets and confidential information, and to otherwise limit the damages arising from turnover of some of its most effective employees, is a reasonable means of furthering a legitimate business purpose.

### (b) Tailoring and Burden

Under New Jersey's *Solari* test, even where a covenant serves legitimate business interests, "it may be limited in its application concerning its geographical area, its period of enforceability, and its scope of activity" so that those interests are not outweighed by the hardship the covenant inflicts on the employee. *Coskey's*, 235 N.J. Super at 635 (citations omitted). To determine the degree, if any, to which the RCA must be blue penciled, the Court must "balance the employer's need for protection and the hardship on the employee that may result." *Ingersoll-Rand,* 110 N.J. at 635.

The RCA's non-compete provision provides that for a one-year period after their departure from ADP, employees may not "participate in any manner with a Competing Business" in the geographic area where the employee worked or had contact with ADP clients if working in that area would require the

employee to "provide the same or substantially similar services to a Competing Business as those which [they] provided to ADP while employed." The non-compete provision also prohibits (former) employees from using or disclosing ADP's trade secrets or other confidential information.

To enforce the RCA would sure impose some burden on Pittman and other former ADP employees who move laterally to positions with competing firms. "The question remains, however, whether this hardship [is] 'undue,' when balanced against the legitimate interest of the employer." *Coskey's*, 235 N.J. Super at 636. *Kusins,* analyzing the RCA, picked up on the suggestion of the Third Circuit in *Rafferty* that the RCA, while potentially overbroad, is enforceable as modified.

*Kusins* held that, after blue-penciling, the non-solicitation and non-compete clauses would prohibit the following:

The direct or indirect solicitation of ADP's actual clients defendants had substantial dealings with, or knowledge of, while at ADP.

The direct or indirect solicitation of ADP's prospective clients that a former employee gained knowledge of during [her] employment at ADP.

Competition with ADP within the geographical limits of the non-compete clause, not confined to any market segment.

2019 WL 3367212 at *21.

I agree with *Kusins'* implementation and application of the holdings of *Rafferty.* Moreover, I defer to *Kusins,* an on-point decision of the State's intermediate appellate court, because it is the most authoritative indicator of how the New Jersey Supreme Court would view the ADP agreements. *See* Section III.B, *supra*, and cases cited.

The non-solicitation clause, as blue penciled by *Kusins,* is not very controversial. The Kusins court determined that the blue penciled non-solicitation portion of the RCA should operate to (1) prohibit the direct or indirect solicitation of ADP's actual clients with whom the employee dealt substantially while at ADP or of whose identity the employee learned during his

or her employment at ADP; and (2) prevent the direct or indirect solicitation of ADP's prospective clients of whose identity the employee learned during his or her employment at ADP.

Pittman has much to say, however, about the non-compete and the geographical and market-segment limitations. She argues that the relevant geographic territory should be based on ZIP codes. And she contends that the relevant market segment should be analyzed based on the number of employees that ADP's prospective and actual clients have.

During the final years of her time at ADP, Pittman sold its products and services to particularly identified employers with between 1,000 and 10,000 employees in Oregon, Vancouver, and Washington. Pittman's assignment was not explicitly defined in terms of a geographic territory, but rather in terms of those specific accounts. That is, Pittman was limited to the 80–120 clients provided to her in ADP's database. Even within Oregon, Vancouver, and Washington, she was not authorized to deal with other existing or prospective ADP clients.

At Ultimate, Pittman is assigned to the geographic region and market segment encompassing employers with 2,500 or more employees in Alaska, Hawaii, Idaho, Montana, Oregon, and Washington. Only two of those states, Oregon and Washington, overlap with her former assignment at ADP. Approximately 35% of her clients at Ultimate are located outside of Oregon and Washington. Pittman also now sells a single bundled solution called UltiPro, which includes payroll, human resources, and talent management solutions. The product that Pittman sold at ADP, recall, was a standalone payroll solution, not a bundled product. It seems that ADP's individual products overlap the components of Ultimate's bundled product, but ADP does not sell a bundled product.

On these facts, Pittman insists that at Ultimate she does not serve the same market segment or territory that she did at ADP. Pittman also emphasizes that at ADP only 15% of her clients had more than 2,500 employees (the market size of her target clients at Ultimate). However, the

Appellate Division has rejected the relevance of this datapoint, noting a lack of "any rationale in the record to blue-pencil a market segment component into the RCA. . . . The customer relationships ADP seeks to protect are the same, regardless of how many employees the client might have." *Kusins*, 2019 WL 3367212 at *17.

Contrary to Pittman's contention, a state is an appropriate unit to define the geographic limits of the RCA. Pittman insists that she was not assigned to a territory, but there is sufficient evidence to infer that she was acting within assigned states. (See DE 23 (listing Pittman's assigned cities in Oregon and Washington)). Her territory during her last two years at ADP included Oregon and Washington, and at Ultimate, her territory now includes both. Thus, she currently provides similar services to Ultimate as she did for ADP in direct violation of the RCAs. Pittman insists that that ZIP codes are an appropriate market division, but this is an arbitrary—and meaningless—dividing line because her accounts at ADP were located in most of the largest cities in both Oregon and Washington.[12] Thus, to excise with precision from both states the ZIP codes in which Pittman may operate would be a laborious and ultimately meaningless exercise. While the *Kusins* court did not discuss geography because the parties there conceded that point, the cases cited by *Kusins* on that issue,[13] hold that it should correspond to the employee's territory while at ADP. For the sake of consistency, and because it makes sense here, I adopt that approach.

The scope of the RCA, as blue penciled in accord with *Kusins,* is reasonably tailored to protect ADP's interest, while ensuring Pittman's ability to ply her trade. Although ADP's business is international, the non-compete

---

[12]   *I.e.* Portland, Salem, and Eugene in Oregon and Seattle, Spokane, and Tacoma in Washington. (DE 23).

[13]   *See ADP, LLC v. Lynch,* Nos. 16-1053, 16-01111, 2016 WL 3574328, at *7–9 (D.N.J. June 30, 2016); *ADP, LLC v. Jacobs,* No. 15-3710, 2015 WL 4670805, at *5 (D.N.J. Aug. 5, 2015); *ADP, LLC v. Manchir,* No. 16-02541, 2017 WL 5185458, at *6–9 (Tenn. Ct. App. Nov. 8, 2017).

provision is limited to the geographic territory in which Pittman worked while at ADP. Pittman has many opportunities to work for Ultimate (or, presumably, another competitor) outside her ADP territory. Indeed, Pittman's territory at Ultimate includes states she did not cover while at ADP and in which she may continue to operate if she does not otherwise violate the RCA.

In sum, when balanced against ADP's legitimate interests, the provisions of the RCA do not severely restrict Pittman from maintaining her livelihood in the same profession, and hence do not impose an undue hardship. Accordingly, the language of the restrictive covenants, as blue penciled, are reasonable and enforceable against Pittman.

### (c) Public Interest

The final *Solari* factor instructs courts to consider the fact that "enforcement of the restriction should not cause harm to the public." *Cmty. Hosp.*, 183 N.J. at 60 (citing *Karlin*, 77 N.J. at 424). Like the ADP cases reviewed in *Rafferty*, this case contains "no major public component." The imposition of restrictive covenants here creates no injury, for example, to "the rights of the public to have free access to the advice of professionals licensed by the State," as it may do in the context of physicians and accountants. *Coskey's*, 253 N.J. Super. at 634. Like *Rafferty*, I find the public interests here to be generic and equivocal.

*    *    *

I therefore find that ADP has a likelihood of success in its attempt to enforce the RCA, as blue-penciled by the Court here. Pittman appears to be violating the RCA into which she entered with ADP. Pittman has taken a position with one of ADP's direct competitors, a position in which she sells competing products. ADP has demanded her compliance with the obligations into which she and it entered and has, moreover, identified case law that recognizes its legitimate business interest in enforcing the agreement. Nonetheless, Pittman has remained in her position at Ultimate and refuses to conform her behavior to accord with the agreement. Her counsel has responded

on her behalf, admitting that she works for Ultimate in three states in which she worked for ADP—Alaska, Oregon, and Washington—in violation of the non-compete. Despite the restricted scope of the RCA, it nonetheless appears that ADP has shown its likelihood of success on the merits.

### 2. Irreparable Harm

Harm is considered "irreparable" if it is not redressable by money damages later, in the ordinary course of litigation. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1964)). ADP has the burden of proving a "clear showing of immediate irreparable harm" absent injunctive relief. *ECRI v. McGraw-Hill Inc.*, 809 F.2d 223, 225 (3d Cir. 1987); *see also Winter*, 555 U.S. at 21 (holding it was error to water down the irreparable harm requirement from "likelihood" to "possibility." even where likelihood of success was strong).

ADP argues that the irreparable harm it will suffer is the loss of existing and prospective clients, employees, marketing partners, confidential and proprietary information, and customer goodwill. Courts in the Third Circuit and this District have had no difficulty in finding that the loss of business opportunities and goodwill constitutes irreparable harm. Likewise. New Jersey courts recognize that "the diversion of a company's customers may. . . constitute irreparable harm . . . . [T]his is so because the extent of the injury to the business as a result of this type of conduct cannot be readily ascertained, and as such, does not lend itself to a straightforward calculation of money damages." *Fluoramics, Inc. v. Trueba*, No. 408-05, 2005 WL 3455185 at *8 (N.J. Super. Ct. Ch. Div. Dec. 16, 2005) (citation omitted). Improper use of trade secrets constitutes irreparable harm. *See U.S. Food Serv., Inc. v. Raad*, 2006 WL 1029653 at *6 (N.J. Super. Ch. Div. Apr. 12, 2006) at *7 ("Damages will not be an adequate remedy when the competitor has obtained the secrets. The cat is out of the bag and there is no way of knowing to what extent their use has caused damage or loss.").

At a minimum, there is overlap between ADP and Ultimate's lines of business. UltiPro and WorkForce Now are overlapping products; Ultimate is a direct competitor of ADP; and Pittman works in her former ADP territory. Together these facts indicate that ADP has made a clear showing that Pittman's behavior establishes a strong likelihood of irreparable harm to ADP that is independent of competitive harm. Such harm consists of potential misuse of confidential information, loss of business opportunities, and impairment of business goodwill. ADP has demonstrated that its injuries cannot be redressed post hoc by money damages. This prong therefore favors a preliminary injunction to prevent irreparable harm.

### 3. Balancing the Equities and the Public Interest

The final two prongs, balancing of the harms and the interest of the public, require little additional discussion. They weigh in favor of granting injunctive relief.

No doubt enforcement of the RCA will cause Pittman some countervailing hardship. But that alleged hardship—requiring her to adhere to the RCA—is neither precisely established nor unduly burdensome. For now, she may not compete with ADP in two states. She may not solicit ADP's actual or prospective clients with which she had substantial dealings, or of which she gained knowledge, while at ADP. She may continue to do everything short of that (provided that her conduct does not otherwise violate the RCA). After a year has passed, Pittman may continue working for Ultimate in the fullest capacity. She may not disclose or exploit confidential information. The opportunities open to Pittman remain substantial.

The public interest, for the reasons stated above, is a neutral factor.

Balancing the four relevant factors, I find that a preliminary injunction is well justified. Accordingly, Pittman is for a period of twelve months enjoined from: (1) directly or indirectly soliciting ADP's actual clients with whom she dealt substantially while at ADP or of whose identity she learned during her employment at ADP; and (2) directly or indirectly soliciting ADP's prospective

clients of whose identity she learned during her employment at ADP. In line with the RCA, the non-competition, non-solicitation, and non-interference provisions shall be enforced for twelve months following Pittman's severance from ADP on June 14, 2019, except that the RCA's tolling provision shall also be enforced.[14]

## V.    CONCLUSION

For the foregoing reasons, ADP's motion for a preliminary injunction is **GRANTED**.

Pursuant to the terms of the RCA, I will grant ADP preliminary injunctive relief. Pittman shall be restrained, for a period of one year after the date of entry of this preliminary injunction, from violating the agreements to the extent stated above.

An appropriate Order granting ADP's motion follows. Within seven days. the parties shall submit an agreed form of preliminary injunction, which shall specify the relief granted to implement the above rulings, and shall propose an amount for the bond, which shall be posted within 15 days. See Fed. R. Civ. P. 65(c) (providing that this Court "may issue a preliminary injunction ... only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined").

---

[14]    The RCA's tolling provision provides that:

The restricted time periods in paragraphs three (3) through six (6) above shall be tolled during any time period that I am in violation of such covenants, as determined by a court of competent jurisdiction, so that ADP may realize the full benefit of its bargain. This tolling shall include any time period during which litigation is pending, but during which I have continued to violate such protective covenants and a court has declined to enjoin such conduct or I have failed to comply with any such injunction.

(DE 3-8)

Dated: October 18, 2019

Hon. Kevin McNulty
United States District Judge